# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAIICHI SANKYO COMPANY, LTD., | ) ) | |
| | ) | C.A. No. 19-2087-CFC |
| *Plaintiff*, | ) ) | |
| v. | ) ) | **UNREDACTED PUBLIC VERSION** |
| SEATTLE GENETICS, INC., | ) ) | **11/22/2019** |
| *Defendant*. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT SEATTLE GENETICS, INC.'S MOTION TO DISMISS**

*Of Counsel:*

MORRISON & FOERSTER LLP
Michael A. Jacobs
Matthew A. Chivvis
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000
mjacobs@mofo.com
mchivvis@mofo.com

Bryan Wilson
Pieter S. de Ganon
755 Page Mill Road
Palo Alto, CA 94304-1018
(650) 813-5600
bwilson@mofo.com
pdeganon@mofo.com

Dated:  November 19, 2019

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6727
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant Seattle Genetics, Inc.*

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ...................................................................................1

II.    NATURE AND STAGE OF THE PROCEEDINGS ...................................2

III.   SUMMARY OF ARGUMENT .................................................................3

IV.    CONCISE STATEMENT OF FACTS.......................................................4

    A.     SGI Pioneers Drug Conjugation Technology .....................................4

    B.     The Agreement ...............................................................................5

    C.     DSC Embarks On A Parallel ADC Program Using SGI's Drug
        Conjugation Technology ...................................................................6

    D.     Applicable Law And Arbitration Clause...............................................7

    E.     DSC's Complaint And SGI's Demand ................................................7

V.     ARGUMENT.........................................................................................9

    A.     The Federal Arbitration Act ("FAA") Governs The Agreement ........9

    B.     DSC's Ownership Claims Should Be Dismissed In Favor Of
        Arbitration ....................................................................................10

        1.     Legal Standard ....................................................................10

        2.     The Agreement's Arbitration Clause Is Valid, Covers
            DSC's Claims, And Must Be Enforced ...................................12

            a.     *A valid agreement to arbitrate exists*............................12

            b.     *DSC's ownership claims fall within the scope of
               the arbitration clause*.....................................................13

        3.     DSC's Ownership Claims Do Not Relate To The "Scope
            Of Any Patent . . . Rights" .......................................................15

    C.     Any Question Regarding Arbitrability Must Be Resolved By
        The Arbitrator, Not The Court .......................................................18

    D.     This Action Should Be Dismissed As Premature Because DSC
        Breached The Agreement's Dispute Resolution Provision...............20

VI.    CONCLUSION....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
 513 U.S. 265 (1995).........................................................................................10

*AT&T Mobility LLC v. Concepcion*,
 563 U.S. 333 (2011)...........................................................................................9

*BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation Corp.*,
 224 F.R.D. 581 (D. Del. 2004) ....................................................................11, 12

*Bd. of Regents, Univ. of Tex. Sys., ex rel. Univ. of Tex. v. Nippon Tel. & Tel. Corp.*,
 414 F.3d 1358 (Fed. Cir. 2005) .......................................................................17

*Beech Aircraft Corp. v. EDO Corp.*,
 990 F.2d 1237 (Fed. Cir. 1993) .......................................................................17

*Brayman Const. Corp. v. Home Ins. Co.*,
 319 F.3d 622 (3d Cir. 2003) ............................................................................14

*Casper v. Gen. Med., P.C.*,
 No. 253474, 2005 WL 1540489 (Mich. Ct. App. June 30, 2005).....................22

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*,
 809 F.3d 746 (3d Cir. 2016) ............................................................................19

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*,
 923 F.2d 245 (2d Cir. 1991) ............................................................................11

*Enovsys LLC v. Nextel Commc'ns, Inc.*,
 614 F.3d 1333 (Fed. Cir. 2010) .......................................................................18

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
 766 F.3d 1338 (Fed. Cir. 2014) .......................................................................17

*Falana v. Kent State Univ.*,
 669 F.3d 1349 (Fed. Cir. 2012) .......................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

*Fernstrom v. Trunzo*,
  No. 2017-0518-PWG, 2017 WL 6028871 (Del. Ch. Dec. 5, 2017),
  *aff'd sub nom. Fernstrom v. Ellis Point Condo. Ass'n, Inc.*,
  198 A.3d 178 (Del. 2018) ....................................................................21

*Gay v. CreditInform*,
  511 F.3d 369 (3d Cir. 2007) ........................................................10, 11

*Harris v. Green Tree Fin. Corp.*,
  183 F.3d 173 (3d Cir. 1999) ...................................................................10

*In re Milo's Kitchen Dog Treats*,
  No. 12-1011, 2013 WL 6628636 (W.D. Penn. Dec. 17, 2013) ..........................14

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
  109 F.3d 1567 (Fed. Cir. 1997) ...............................................................18

*Medtronic AVE Inc. v. Cordis Corp.*,
  100 F. App'x 865 (3d Cir. 2004) .............................................................13

*Mendez v. Palm Harbor Homes, Inc.*,
  45 P.3d 594 (Wash. Ct. App. 2002)............................................................13

*Microchip Tech. Inc. v. U.S. Philips Corp.*,
  367 F.3d 1350 (Fed. Cir. 2004) ...............................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)............................................................................9, 11

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
  243 U.S. 502 (1917)........................................................................16, 17

*Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*,
  285 P.3d 70 (Wash. Ct . App. 2012)............................................................14

*Nikoonahad v. Rudolph Techs., Inc.*,
  No. C 08-2290 JF (PVT), 2009 WL 1330811
  (N.D. Cal. May 13, 2009) ....................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

*Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*,
   No. 18-698-RGA, 2018 WL 4905593 (D. Del. Oct. 9, 2018).............................19

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
   363 U.S. 574 (1960).........................................................................................11

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
   196 F.3d 1366 (Fed. Cir. 1999) .........................................................................17

*ValuePart, Inc. v. Farquhar*,
   No. 14-cv-3004, 2014 WL 4923179 (N.D. Ill. Sept. 29, 2014) .........................13

*Weyerhaeuser Co. v. Commercial Union Ins. Co.*,
   15 P.3d 115 (Wash. 2000) (en banc) .................................................................16

*Wright v. Early Warning Sys. Inc.*,
   No. 10-988-GMS, 2012 WL 579310 (D. Del. Feb. 22, 2012) ...........................12

**Statutes**

9 U.S.C.
   § 1..................................................................................................................10
   § 2...............................................................................................................9, 12
   § 4..................................................................................................................10

Wash. Rev. Code Ann. § 7.04A.060......................................................................12

## I.     INTRODUCTION

Plaintiff Daiichi Sankyo Company ("DSC") cannot proceed on its claims against Seattle Genetics ("SGI") *except* in arbitration, because the parties' 2008 Collaboration Agreement (the "Agreement") requires it.

DSC seeks a declaratory judgment "with respect to [DSC]'s ownership of the Patents and Patent Applications at Issue and SGI's claimed patent rights *under the Collaboration Agreement*."  (D.I. 1 at 14 ¶ 52 (emphasis added).)  DSC's Complaint, however, omits that the parties agreed to arbitrate "*any* dispute or disagreement [that] arises between [the parties] in respect of this Agreement." (Ex. 1[1] §§ 19.3 (emphasis added), 19.3.4; *see also* Ex. 2 (public version).)  Because DSC's ownership claims arise in respect of the Agreement, they fall squarely within the terms of the parties' agreement to arbitrate.

SGI's demand for arbitration, submitted last week to the American Arbitration Association in Seattle and included with this motion, sets forth the parties' dispute.  (Ex. 3.)  There, SGI describes its unique expertise in antibody-drug conjugate development, the parties' contractual relationship to promote such drug development, the ownership provisions SGI insisted upon to protect against misuse of its technology, SGI's discovery that DSC embarked on a parallel

---

[1] Cited exhibits are attached to the Declaration of Matthew Chivvis, filed contemporaneously herewith.

program to use SGI's technology, and DSC's failure to perfect SGI's ownership of

"Improvements" to this technology as the Agreement required.  (*Id.* ¶¶ 13-35.)

SGI's arbitration demand also details its efforts—in compliance with the

Agreement's dispute resolution provisions—to resolve its claims with DSC.  (*Id.*

¶¶ 6-8.)  Before the parties had exhausted the agreed-upon dispute resolution

process, DSC sued.

Relying on a narrow exception to arbitration, DSC attempts to characterize

the dispute as involving patent "scope."  But patent scope is not at issue.  Instead,

as DSC repeatedly concedes, the dispute is about patent ownership, which does not

fall within the exception.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

SGI, a Delaware corporation headquartered in Seattle, learned this year that

DSC, a Japanese corporation headquartered in Tokyo, had violated certain

ownership provisions of the Agreement.  Pursuant to the Agreement's dispute

resolution procedures, SGI sent DSC a Notice of Dispute on August 19, 2019, and

requested a meeting.  (Ex. 1 § 19.3.1; Ex. 4.)  DSC refused, arguing that no dispute

was presented and that a "meeting pursuant to Section 19.3.2 [was] premature."

(Ex. 5.)  DSC maintained that "substantive dialogue is required before [SGI] can

conclude that there is a dispute or disagreement that requires a Notice of Dispute."

(*Id.*)  Nothing in the Agreement so requires.

After SGI insisted on following the agreed-upon dispute resolution procedure (Ex. 6), DSC agreed to schedule a meeting, to take place on September 23, 2019, several weeks later than required. (Ex. 1 § 19.3.2.)

SGI requested a follow-up meeting on October 4, 2019. (Ex. 8; Ex. 9.) SGI also committed Dr. Clay Siegall, its President and Chief Executive Officer, to an in-person meeting with a DSC executive on November 6, 2019, in compliance with the Agreement. (Ex. 1 § 19.3.3; Ex. 10.)

Two days *before* the November 6 meeting, DSC filed this suit, claiming that "[d]espite its attempts, it was unable to resolve its dispute with SGI." (D.I. 1 at 11 ¶ 41.) DSC also issued a public press release announcing the filing of this lawsuit, notwithstanding the parties' understanding that certain aspects of the Agreement and related correspondence were confidential. (Ex. 11.)

### III. SUMMARY OF ARGUMENT

1.      This suit concerns ownership of Improvements pursuant to the terms of the parties' Agreement and arises "in respect of" the Agreement. (Ex. 1 § 19.3.) Contrary to DSC's Complaint, the dispute is not over patent "scope" and hence is not subject to the Agreement's limited arbitrability exception. Rather, DSC's claim to Improvements is subject to arbitration in Seattle, Washington (*id.* § 19.3.4), and the Court should dismiss it here. In the alternative, the Court should stay the case and refer DSC's claim to the arbitrator to decide arbitrability.

2.     In any event, DSC's claim is infirm as unripe because DSC filed its Complaint before the second required meeting under the Agreement (*id.* § 19.3.3), and served it two days after the meeting instead of the 30 required (*id.* § 19.3.4). Dismissal is appropriate for DSC's end-run around the dispute resolution provisions of the Agreement.

## IV.     CONCISE STATEMENT OF FACTS

### A.     SGI Pioneers Drug Conjugation Technology

SGI is a pioneer in antibody-drug conjugates ("ADCs")—therapeutics comprised of antibodies to specific disease targets that are linked to payloads such as anti-cancer drugs.  This linking is called "conjugation," and is achieved using a component referred to as a "linker."  Of the five currently approved ADCs in the United States, two—ADCETRIS® and POLIVY®—use SGI's proprietary drug conjugation technology.  DSC has no approved ADCs on the U.S. market.

Hoping to develop ADC products, DSC sought SGI's help with drug conjugation technology.  In 2006, SGI and DSC entered into their first agreement to produce and evaluate certain antibodies conjugated using SGI's technology. Following promising results, the relationship expanded, resulting in the parties' 2008 Collaboration Agreement to research and develop ADC products for a designated antigen, DR5.  (Ex. 1; Ex. 2.)

### B.    The Agreement

The Agreement's preamble highlights the parties' differing competencies and lays out the collaboration's goals.  While DSC controlled rights relating to antibodies to DR5, it was SGI that controlled rights relating to technology "useful for linking" antibodies to cytotoxic compounds.  (Ex. 1, Preamble.)  SGI's rights included its proprietary peptide-based linker technology, called "Firestone Linkers."  DSC sought SGI patent rights and know-how relating to SGI's "linker technology," including Firestone Linkers, for use in development.  (*Id.*)

Because the collaboration involved a broad license to SGI's fundamental technology, SGI ensured that it retained control over any "Improvements" within its area of core expertise by insisting on express terms to that effect.  The parties agreed to an intellectual property framework that struck the following balance: DSC would receive a license to SGI's patent rights and proprietary drug conjugation know-how for use in developing and commercializing an ADC targeting DR5.  In return, SGI would own all Improvements related to its drug conjugation technology—regardless of which antibody or cytotoxic/cytostatic compound was conjugated, and regardless of which party developed those Improvements.  (*See* Ex. 3 ¶¶ 20-24.)  DSC promised to "promptly notify SGI of the discovery of [any] Improvement that relates to the Drug Conjugation Technology."  (Ex. 1 § 3.3.1.)  DSC also agreed it could not take SGI's

5

Confidential Information—defined broadly to include SGI Know-How, Improvements, and so on—and use it for any purpose except as the Agreement "expressly authorized and contemplated." (*Id.* § 8.1.)

SGI undertook its obligations under the Agreement in good faith, providing DSC with extensive access to SGI technology. In addition to licensing DSC to a wide array of foundational intellectual property rights, SGI provided DSC with proprietary technical knowledge about SGI's drug conjugation technology, including vital "research bench" insights into how to implement the technology.

### C. DSC Embarks On A Parallel ADC Program Using SGI's Drug Conjugation Technology

After years of benefitting from expansive access to SGI technology, DSC abruptly terminated the Agreement in 2015, citing activity and toxicity issues with the drug then under development. SGI was disappointed by DSC's decision because the collaboration showed promise. SGI had, moreover, received no royalty payments under the Agreement.

Unbeknownst to SGI, DSC had embarked on a parallel ADC program to develop linker technology composed of the same elements in the same sequence as SGI's proprietary Firestone Linkers, thereby creating Improvements that relate to SGI's drug conjugation technology. These Improvements are now implemented in ADC products in DSC's pipeline, such as DS-8201, U3-1402, DS-1062, and DS-7300. They are also reflected in the Patents and Patent Applications at Issue, as

defined in DSC's Complaint.  (D.I. 1 at 6 ¶ 24.)  DSC did not disclose these Improvements to SGI.

### D.    Applicable Law And Arbitration Clause

The parties agreed that the Agreement would be "governed by and construed in accordance with the laws of the State of Washington and the United States of America."  (Ex. 1 § 19.2.)  They agreed, further, that "if any dispute or disagreement arises between [DSC] on the one hand and SGI on the other in respect of this Agreement . . . then the same shall be submitted by the Parties for resolution by an arbitral body in Seattle, Washington in accordance with the then-current commercial arbitration rules of the American Arbitration Association ('AAA') except as otherwise provided herein."  (*Id.* §§ 19.3, 19.3.4.)  The Agreement recites only one exception—namely that "[n]otwithstanding the foregoing, any disputes relating to *inventorship or the validity, enforceability or scope* of any patent or trademark right shall be submitted for resolution by a court of competent jurisdiction."  (*Id.* § 19.3.6 (emphasis added).)

### E.    DSC's Complaint And SGI's Demand

DSC claims an "actual, present, and justiciable controversy relating to the *scope* of patent rights."  (D.I. 1 at 13 ¶ 50 (emphasis added).)  But just a few paragraphs later, DSC claims an "actual, present, and justiciable controversy . . . with respect to [DSC]'s *ownership* of the Patents and Patent Applications at Issue

and SGI's claimed patent rights under the Collaboration Agreement." (D.I. 1 at 14 ¶ 52 (emphasis added).)  The latter, not the former, best describes the controversy: DSC's allegations are about patent ownership, not scope.

Thus, DSC asks this Court to declare that it "has *ownership* rights to the Patents and Patent Applications at Issue, and SGI has no *ownership* interest in the Patents and Patent Applications at Issue as they do not constitute Improvements of Drug Conjugation Technology as defined in the Collaboration Agreement." (*Id.* ¶ 56 (emphasis added).)  In seeking that relief, DSC acknowledges that, under the Agreement, SGI owns "Improvements that relate to the Drug Conjugation Technology." (*Id.* at 9 ¶ 35.)  And DSC acknowledges that, insofar as "such Improvements shall have been conceived, developed or reduced to practice by [DSC]," DSC agreed to "assign[] all of its right, title and interest therein to SGI." (*Id.*)  In sum, DSC's complaint is entirely about who owns the technology reflected in the Patents and Patent Applications at Issue, which turns on application of the Agreement's "Improvements" clause.

SGI's arbitration demand presents the same dispute—namely, "the ownership of certain improvements relating to SGI's drug conjugation technology" under the Agreement. (Ex. 3 ¶ 1.)  Like DSC, SGI focuses on the parties' agreement that "SGI would own any Improvements relating to SGI's Drug Conjugation Technology, as those terms are defined in the Agreement, and,

further, that DSC would 'hereby assign' any such Improvements to SGI." (*Id.* ¶ 3.)
And like DSC, SGI contends that an "actual, immediate, and real controversy has
arisen . . . regarding the ownership of certain intellectual property, patents, and/or
applications—including, but not limited to, [the Patents and Patent Applications at
Issue]." (*Id.* ¶ 38.)  Finally, mirroring DSC, SGI seeks an "order declaring SGI the
sole and rightful owner and legal title holder of," among other things, the Patent
and Patent Applications at Issue.  (*Id.* ¶ 46 A.)  Unlike DSC, however, SGI seeks
relief in arbitration, not from the Court, consistent with the Agreement.

### V.    ARGUMENT

#### A.    The Federal Arbitration Act ("FAA") Governs The Agreement

"[D]esigned to promote arbitration," the FAA evinces a national policy
favoring arbitration and a liberal federal policy favoring arbitration agreements.
*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011).  Congress
intended that where parties have agreed to arbitrate and their agreement is
governed by the FAA, they be moved "out of court and into arbitration as quickly
and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1, 22 (1983).

The FAA applies because the Agreement "involv[es] commerce." 9 U.S.C.
§ 2.  The phrase "involving commerce" extends the reach of the FAA to the full
extent of Congress's power under the Commerce Clause, embracing any contract

that "affects" commerce, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995), including, as here, international commerce, *see* 9 U.S.C. § 1 (defining "commerce").

The Agreement fits within this definition:  It contemplates that DSC, a Japanese company, would pay SGI, a U.S. company, research fees, license fees, and royalty fees in exchange for, among other things, access to SGI's intellectual property.  (Ex. 1 § 6.)  This plainly "affects commerce."  *See, e.g.*, *Microchip Tech. Inc. v. U.S. Philips Corp.*, 367 F.3d 1350, 1354 (Fed. Cir. 2004) (FAA applicable to patent license agreement).

### B.   DSC's Ownership Claims Should Be Dismissed In Favor Of Arbitration

#### 1.   Legal Standard

Section 4 of the FAA requires courts to "direct" parties to arbitration "in accordance with the terms of the agreement" upon a motion of a party to the agreement.  9 U.S.C. § 4.  "Federal law determines whether an issue governed by the FAA is referable to arbitration."  *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999).  Likewise, "[q]uestions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law."  *Id.* at 179.  Courts may, however, apply state law when assessing issues of contract formation.  *Gay v. CreditInform*, 511 F.3d 369, 388 (3d Cir.

2007).  Because arbitration is a matter of consent, courts will defer to the parties'

choice-of-law provision.  *Id.* at 388–89.

In determining arbitrability, courts ask, first, whether the parties entered into

a valid arbitration agreement; and, second, whether the specific dispute falls within

the scope of the agreement.  *BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation

Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004).

In making this determination, courts apply a "strong presumption in favor of

arbitration."  *Gay*, 511 F.3d at 387.  This presumption is even stronger in the

context of international business transactions such as this one.  *David L. Threlkeld

& Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 248 (2d Cir. 1991).

Thus, under the FAA, "any doubts concerning the scope of arbitrable issues should

be resolved in favor of arbitration, whether the problem at hand is the construction

of the contract language itself or an allegation of waiver, delay, or a like defense of

arbitrability."  *Moses H. Cone*, 460 U.S. at 24–25.  The arbitrability presumption is

so robust that a court may not deny arbitration, "unless it may be said with positive

assurance that the arbitration clause is not susceptible of an interpretation that

covers the asserted dispute."  *United Steelworkers of Am. v. Warrior & Gulf

Navigation Co.*, 363 U.S. 574, 582–83 (1960).

"Once a court answers both inquiries in the affirmative, it must refer

questions regarding the enforceability of the terms of the underlying contract to an

arbitrator."  *BAE*, 224 F.R.D. at 585 (citing *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997)).  "If a valid and enforceable agreement to arbitrate governs the dispute, the court lacks jurisdiction," and the case should be dismissed.  *Wright v. Early Warning Sys. Inc.*, No. 10-988-GMS, 2012 WL 579310, at *3 (D. Del. Feb. 22, 2012) (citing *Harris*, 183 F.3d at 179).

> ### 2.    The Agreement's Arbitration Clause Is Valid, Covers DSC's Claims, And Must Be Enforced
>
> #### a.    *A valid agreement to arbitrate exists*

Under both the FAA and Washington State law, an arbitration agreement is presumed valid.  9 U.S.C. § 2 ("[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); Wash. Rev. Code Ann. § 7.04A.060 (same).

Here, DSC, a sophisticated party represented by counsel, entered into an agreement with SGI to submit "any dispute or disagreement" that "arises . . . in respect of th[e] Agreement" to binding arbitration in Seattle, Washington.  (Ex. 1 §§ 19.3, 19.3.4.)  DSC has embraced the Agreement, having "filed this action pursuant to," premised its ownership claims on, and tied the relief it seeks to the Agreement.  (D.I. 1 at 13 ¶ 50, 14 at ¶¶ 52, 54-56, 15 at Prayer for Relief ¶¶ B-C.)

While DSC terminated the Agreement on April 1, 2015 (Ex. 12), Section 19

survives termination (Ex. 1 § 13.6.1).

Hence, a valid agreement to arbitrate exists.

### b. *DSC's ownership claims fall within the scope of the arbitration clause*

The Agreement calls for arbitration of "*any* dispute or disagreement [that]

*arises . . . in respect of* this Agreement."  (Ex. 1 §§ 19.3 (emphasis added), 19.3.4.)

The Third Circuit gives broad construction to "arising" language:

> [W]hen phrases such as "arising under" and "arising out of" appear in arbitration provisions, they are normally given broad construction.  Coupled with our usual strong presumption in favor of arbitrability, a clause providing for the arbitration of all matters "arising from" an agreement overwhelmingly suggests that a given dispute is arbitrable.

*Medtronic AVE Inc. v. Cordis Corp.*, 100 F. App'x 865, 868 (3d Cir. 2004)

(citations omitted).  Washington State law is no different.  *See, e.g.*, *Mendez v.*

*Palm Harbor Homes, Inc.*, 45 P.3d 594, 600–01 (Wash. Ct. App. 2002) (arbitration

clause incorporating "arising from" deemed broad in scope).

Section 19.3's "in respect of" language does not narrow the scope of

arbitrable issues.  *ValuePart, Inc. v. Farquhar*, No. 14-cv-3004, 2014 WL

4923179, at *7 (N.D. Ill. Sept. 29, 2014) ("the phrase 'in respect of' in the

arbitration provision . . . impart[s] the same 'extremely broad' reach as the phrases

'arising out of' or 'relating to.'").  To the contrary, "in respect of" likely *broadens*

the scope of arbitrable issues. *In re Milo's Kitchen Dog Treats*, No. 12-1011, 2013 WL 6628636, at \*2 (W.D. Penn. Dec. 17, 2013); *cf. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 285 P.3d 70, 79 (Wash. Ct . App. 2012) (calling "broadly-worded" an indemnification provision for liability or claims "arising in respect of").

DSC's ownership claims plainly "arise[] . . . in respect of" the Agreement. DSC concedes this.  It contends that a "declaration by this Court of [DSC]'s ownership rights to the Patent and Patent Applications at Issue will resolve SGI's threat and claimed patent rights under the Collaboration Agreement."  (D.I. 1 at 4 ¶ 13.)  It accepts that the Agreement determines what intellectual property rights DSC owns (*id.* at 8 ¶ 30), what "SGI shall own" (*id.* at 9 ¶ 35), and what rights DSC agreed to assign (*id.*).  It recognizes that SGI owns "Improvements that relate to Drug Conjugation Technology," which are terms defined by the Agreement, the meaning or application of which must be determined to resolve the dispute. (*Id.* at 9 ¶ 35.)

Moreover, under Third Circuit law, "[i]f the allegations underlying the claims 'touch matters' covered by [an arbitration clause in a contract], then those claims must be arbitrated, whatever the legal labels attached to them." *Brayman Const. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (citation omitted). The gravamen of DSC's Complaint is that "SGI has no ownership interests in the

Patents and Patent Applications at Issue as they do not constitute Improvements of Drug Conjugation Technology as defined in the Collaboration Agreement." (D.I. 1 at 15 ¶ B; *see also id.* at 14 ¶ 54.) Not only do DSC's ownership claims "touch matters" covered by the Agreement; they are practically and legally impossible to adjudicate without undertaking an in-depth analysis of the Agreement's terms.

DSC's ownership claims, therefore, fall within the scope of the parties' arbitration clause and should be submitted for arbitration.

### 3.    DSC's Ownership Claims Do Not Relate To The "Scope Of Any Patent . . . Rights"

DSC claims an "actual, present, and justiciable controversy . . . with respect to [DSC]'s *ownership* of the Patents and Patent Applications at Issue." (D.I. 1 at 14 ¶ 52 (emphasis added).) Elsewhere, however, DSC claims an "actual, present, and justiciable controversy relating to the *scope* of patent rights." (*Id.* at 13 ¶ 50 (emphasis added).) DSC shifts from "ownership" to "scope" in an attempt to end-run arbitration and avail itself of Section 19.3.6, which sends to court "disputes relating to inventorship or the validity, enforceability or *scope* of any patent . . . rights." (Ex. 1 § 19.3.6.) DSC's attempted dodge should be rejected.

*First*, "ownership" is not "scope of any patent" under the Agreement. Section 9's provisions dealing with "Program Inventions"—the "inventions directly arising out of activities conducted under" the Agreement—illustrate this distinction. (*Id.* §§ 9.1.2, 9.1.1.) The parties used the word "ownership" in

15

Section 9 to mean "right, title, and interest." (*Id.* § 9.1.2.)  Later in Section 9, the parties agreed to disclose communications with patent authorities that could "materially affect the *scope of any patent* or patent application covering Program Inventions." (*Id.* § 9.2.2 (emphasis added).)  The parties thus plainly assigned different meanings to patent "ownership" and patent "scope."  On the one hand, they used "ownership" to mean "right, title, and interest" in the inventions, including title to "related Patents." (Ex. 1 § 9.1.2(d).)  On the other hand, they used "scope" to mean what "any patent" covers—to mean its claims.  "In the absence of anything in the context of a contract clearly indicating a contrary intent, when the same word is used in different parts of the contract, it will be presumed to be used in the same sense throughout the contract."  *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 124 (Wash. 2000) (en banc).  Thus, it can and should be presumed that "scope of any patent" rights in Section 19.3.6 means patent coverage, not title.

*Second*, "ownership" is not "scope" under the law.  Here, again, "scope" of a patent right means what the patent covers, which is conceptually and legally separate from who owns it.  "The scope of every patent is limited to the invention described in the claims contained in it, read in [] light of the specification."  *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510 (1917).  These "have been aptly likened to the *description in a deed*," which is different than the

deed itself. *Id.* (emphasis added). Thus, it is the "claims," not title, that "define the scope of the patent right," *e.g.*, *Falana v. Kent State Univ.*, 669 F.3d 1349, 1355 (Fed. Cir. 2012); and it is "claim construction," not title, that is the "legal statement of the scope of the patent right," *e.g.*, *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014). "Ownership, however, is a question of who owns legal *title* to the subject matter claimed in a patent, patents having the attributes of personal property." *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) (citing 35 U.S.C. § 261) (emphasis added). Ownership is *not* a question of what the patent claims.

*Third*, viewed in its immediate textual context, the word "scope" does not mean "ownership." Section 19.3.6 sends to court "disputes relating to inventorship or the validity, enforceability or scope of any patent . . . rights." (Ex. 1 § 19.3.6.) These words necessarily implicate substantive federal patent law. *E.g.*, *Bd. of Regents, Univ. of Tex. Sys., ex rel. Univ. of Tex. v. Nippon Tel. & Tel. Corp.*, 414 F.3d 1358, 1363 (Fed. Cir. 2005) ("[I]ssues of inventorship, infringement, validity, and enforceability present sufficiently substantial questions of federal patent law."); *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1372 (Fed. Cir. 1999) (inventorship is solely a matter of federal law). Because the issues in Section 19.3.6 necessarily implicate questions of federal patent law, the parties chose to have them heard by a "court of competent jurisdiction." (Ex. 1 § 19.3.6.)

17

By contrast, patent ownership and assignment do not implicate patent law; they are governed by state law. *See Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010) ("Who has legal title to a patent is a question of state law."); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("question of whether a patent is valid and infringed ordinarily is one for federal courts, while the question of who owns the patent rights and on what terms typically is a question exclusively for state courts").

It is not surprising, then, that the parties chose to arbitrate issues of ownership. As DSC's Complaint repeatedly highlights, the purpose of the Agreement was to articulate the contours of the parties' research collaboration as well as any license and ownership rights that flowed therefrom. (*E.g.*, D.I. 1 at 2 ¶ 6 (Agreement covers assignment of patents and patent application), 8 at ¶ 29 (same covers license rights), 9 at ¶ 35 (same covers ownership rights).)

DSC's claims should be dismissed and referred to arbitration.

## C. Any Question Regarding Arbitrability Must Be Resolved By The Arbitrator

Even if there were any doubt about the reach of the Agreement's arbitration clause, that issue must be resolved by the arbitrator. By incorporating the American Arbitration Association ("AAA") rules in the Agreement's arbitration clause, DSC and SGI intended that the arbitrator decide arbitrability.

"[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763–64 (3d Cir. 2016) (collecting cases).  Courts in this District are no exception.  *See, e.g.*, *Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, No. 18-698-RGA, 2018 WL 4905593, at *2 (D. Del. Oct. 9, 2018) (Incorporation of the "AAA rules into the arbitration provision" constitutes "clear and unmistakable evidence that arbitrability is to be determined by the arbitration panel.").

The Agreement's arbitration clause provides that the parties shall arbitrate "in accordance with the then-current commercial arbitration rules of the American Arbitration Association ('AAA') . . . ."  (Ex. 1 §§ 19.3, 19.3.4.)  Rule 7(a) of the AAA Commercial Arbitration Rules grants arbitrators the authority to determine their own jurisdiction:  "The Arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  (Ex. 13 at 13.)

The Court should enforce the parties' agreement, refer the case to the arbitrator to decide any disputes about arbitrability, and dismiss it here.

**D.    This Action Should Be Dismissed As Premature Because DSC Breached The Agreement's Dispute Resolution Provision**

This dispute should also be dismissed as unripe.  Although the Agreement requires the parties to wait 30 business days from the second meeting before filing suit, DSC sued before the second meeting even took place.  In so doing, DSC violated the Agreement's dispute resolution procedures, which is an independent ground for dismissal.  The relevant provisions read as follows:

> **19.3.3**  If, within a further period of fourteen (14) business days, the dispute has not been resolved, the President of SGI and an Executive Officer of Licensee *shall* meet . . . ;
>
> **19.3.4**  If, within a further period of thirty (30) business days, the dispute has not been resolved or if, for any reason, the required meeting has not been held, then the same *shall* be submitted by the Parties for resolution by an arbitral body in Seattle, Washington . . . .

(Ex. 1 §§ 19.3-19.3.4, 19.3.6 (emphasis added).)

As noted, SGI committed SGI's President and CEO to an in-person meeting with a DSC executive on November 6, 2019, in compliance with the Agreement. (*Id.* § 19.3.3.)  Two days before the meeting, DSC filed this lawsuit, claiming that "[d]espite its attempts, [DSC] was unable to resolve its dispute with SGI."  (D.I. 1 at 11 ¶ 41.)  This is demonstrably false:  Rather than attempt to resolve the dispute in a meeting with SGI's most senior executive, DSC sued.  Moreover, although required to wait 30 business days from the date of the second meeting (*id.*

§ 19.3.4), DSC served SGI only two days after the parties met.  In so doing, DSC breached the Agreement again.

Should DSC argue that Section 19.3.6 may be invoked without exhausting the Agreement's dispute resolution procedures, that argument is belied by DSC's correspondence.  There, DSC repeatedly concedes that it was engaging in the contractually mandated dispute resolution process.  (*E.g*., Ex. 5 (noting that SGI's Notice and meeting request "pursuant to Section 19.3.2" were "premature"); Ex. 14 (DSC written summary expressly submitted "[p]ursuant to Section 19.3.2").)  While Section 19.3.6 constitutes, in appropriate circumstances, an alternative to arbitration (*see* Ex. 1 § 19.3.4 (the parties shall arbitrate "except as otherwise provided herein")), it does not dispose of the mandated 30-day waiting period.

Delaware courts have held that dismissal is proper when a plaintiff fails to comply with the requirements of a contractual dispute resolution provision.  *See, e.g.*, *Fernstrom v. Trunzo*, No. 2017-0518-PWG, 2017 WL 6028871, at *3–4 (Del. Ch. Dec. 5, 2017), *aff'd sub nom. Fernstrom v. Ellis Point Condo. Ass'n, Inc.*, 198 A.3d 178 (Del. 2018) (recommending complaint be dismissed because plaintiff failed to comply with contractual alternative dispute resolution process). Other courts agree.  *See, e.g.*, *Nikoonahad v. Rudolph Techs., Inc.*, No. C 08-2290

21

JF (PVT), 2009 WL 1330811, at *4 (N.D. Cal. May 13, 2009); *Casper v. Gen. Med., P.C.*, No. 253474, 2005 WL 1540489, at *3 (Mich. Ct. App. June 30, 2005).

## VI.   CONCLUSION

The Agreement unequivocally provides for binding arbitration to resolve the claims at issue here.  Accordingly, this Court should refer the claims to the arbitrator and dismiss them here, or, in the alternative, stay the claims so the arbitrator may decide arbitrability.  In any event, the claims should be dismissed as unripe.

Dated: November 19, 2019

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Of Counsel:*

MORRISON & FOERSTER LLP
Michael A. Jacobs
Matthew A. Chivvis
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000

Bryan Wilson
Pieter S. de Ganon
755 Page Mill Road
Palo Alto, CA 94304-1018
(650) 813-5600

  */s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6727
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant
Seattle Genetics, Inc.*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document complies with the Court's

type and number limitations because it has been prepared in Times New Roman

14-point typeface using Microsoft Word, and contains 4,925 words as determined

by the Word Count feature of Microsoft Word 2016, exclusive of the caption,

tables, and signature blocks.

Dated: November 19, 2019

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

  _/s/ Samantha Wilson_
Anne Shea Gaza (No. 4093)
Samantha Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6727
agaza@ycst.com
swilson@ycst.com

_Attorneys for Defendant_
_Seattle Genetics, Inc._

<u>**CERTIFICATE OF SERVICE**</u>

I, Anne Shea Gaza, hereby certify that on November 22, 2019, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick
> Andrew C. Mayo
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> P.O. Box 1150
> Wilmington, DE 19899
> (302) 654-1888
> sbalick@ashbygeddes.com
> amayo@ashbygeddes.com
>
> *Attorneys for Plaintiff*

I further certify that on November 22, 2019**,** I caused the foregoing document to be served via electronic mail upon the above-listed counsel and on the following counsel:

> Preston K. Ratliff II
> Joseph M. O'Malley
> Isaac S. Ashkenazi
> Ashley N. Mays-Williams
> PAUL HASTINGS LLP
> 200 Park Avenue
> New York, NY 10166
> (212) 318-6000
> prestonratliff@paulhastings.com
> josephomalley@paulhastings.com
> isaacashkenazi@paulhastings.com
> ashleymayswilliams@paulhastings.com
>
> *Attorneys for Plaintiff*

Dated:  November 22, 2019

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP

*/s/ Anne Shea Gaza*       
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
*agaza@ycst.com*
*swilson@ycst.com*

*Attorneys for Seattle Genetics Inc.*

2