## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAIICHI SANKYO COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-2087-CFC-SRF |
| | ) | |
| SEATTLE GENETICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this action for a declaratory judgment, pursuant to 28 U.S.C. § 2201, is a motion filed by defendant Seattle Genetics, Inc. ("SGI") to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively to stay the action pending the outcome of arbitration.[1]  (D.I. 6)  For the following reasons, the court recommends DENYING defendant's motion to dismiss and GRANTING defendant's motion to stay.

### II. BACKGROUND

#### a. The Parties

Plaintiff Daiichi Sankyo Company, Limited ("DSC") is a corporation existing under the laws of Japan with a principal place of business in Tokyo, Japan.  (D.I. 1 at ¶ 15)  DSC is a global pharmaceutical company which has researched antibody drug conjugates ("ADC")[2] to

---

[1] The briefing for the pending motion is as follows:  defendant's opening brief (D.I. 7), plaintiff's answering brief (D.I. 20), and defendant's reply brief (D.I. 22).

[2] "ADCs include a class of medicines designed to deliver targeted cytotoxic chemotherapy to cancer cells.  ADCs typically consist at least of an antibody, a linker, and a cytotoxic payload."  (D.I. 1 at ¶ 2)

target and deliver chemotherapy to cancer cells and reduce systemic exposure to chemotherapy. (*Id.* at ¶¶ 21-23) DSC's developed ADC technologies include United States Patent Numbers 9,808,537 ("the '537 patent"), 9,850,312 ("the '312 patent"), 9,872,924 ("the '924 patent"), 10,195,288 ("the '288 patent") (collectively, "the patents in issue"). (*Id.* at ¶ 24) DSC's ADC technologies resulted in United States Patent Application Numbers 15/285,156, 15/302,803, 15/579,512, 15/821,662, 15/821,697, 16/130,615, 16/142,354, 16/256,715, 16/264,395, and 16/330,085 and International Patent Application Numbers PCT/JP2017/036215, PCT/JP2018/007152, and PCT/JP2018/018572 (collectively, "the patent applications in issue"). (*Id.*)

SGI is a corporation existing under the laws of Delaware with a principal place of business in Bothell, Washington. (*Id.* at ¶ 16) SGI is a biotechnology company that develops and commercializes targeted cancer therapies, including ADC technology. (*Id.* at ¶ 25)

**b. Facts**[3]

This action arises from a dispute regarding the ownership of plaintiff's patents and patent applications following the termination of the parties' collaboration agreement ("the Collaboration Agreement"). Plaintiff seeks a declaratory judgment that it has ownership rights to the patents and patent applications in issue and that defendant has no such ownership rights. (D.I. 1 at ¶¶ 51-56)

On November 30, 2006, DSC entered into a research collaboration agreement with SGI to produce and evaluate ADCs and to explore a business relationship. (*Id.* at ¶ 28) On July 2, 2008, DSC and SGI entered into the Collaboration Agreement, granting DSC an exclusive

---

[3] The facts in this section are based upon allegations in the complaint, which the court accepts as true for the purposes of the present motion to dismiss. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

worldwide license under SGI patent rights and "know-how" related to SGI's ADC technology for use with DSC's antibody. (*Id.* at ¶ 29) Pursuant to the Collaboration Agreement, DSC conducted research, hoping to discover a clinical drug candidate composed of "a conjugation of an anti-DR5 antibody to MMAE or MMAF via a cleavable Val-Cit-PABC dipeptide-based linker and to MMAF via a non-cleavable linker." (*Id.* at ¶ 37) Concurrently, DSC conducted research on different types of ADCs unrelated to the subject matter of the Collaboration Agreement, which resulted in at least three novel ADCs now conceived in DSC patents and patent applications. (*Id.* at ¶ 8)

However, DSC's research under the Collaboration Agreement did not result in the discovery of any clinical drug candidate. (*Id.* at ¶ 37) On April 1, 2015, DSC provided SGI with a notice of termination of the Collaboration Agreement. (*Id.*) The termination became effective on June 30, 2015. (*Id.*) Following the termination of the Collaboration Agreement, SGI initiated discussions with DSC regarding another potential research collaboration, but DSC declined SGI's offer. (*Id.* at ¶ 10)

On August 19, 2019, SGI sent a letter to DSC alleging that its novel ADC technology constituted "Improvements" under the Collaboration Agreement, such that SGI owned a subset of the patents and patent applications in issue. (*Id.* at ¶ 39) On August 27, 2019, DSC responded to SGI, disputing the claims made in the August 19, 2019 letter. (*Id.* at ¶ 40) On September 23, 2019, representatives from DSC and SGI met in Chicago, Illinois. (*Id.* at ¶ 41) At that meeting, DSC learned that SGI claimed to own each of the patents and patent applications in issue.

3

On November 4, 2019, plaintiff originally filed this declaratory judgment action. (D.I. 1) Plaintiff alleges that the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*Id.* at ¶ 17) On November 12, 2019, SGI filed a demand for arbitration with the American Arbitration Association ("AAA"). (D.I. 9, Ex. 3) On November 19, 2019, defendant filed the present motion to dismiss, or alternatively to stay the action pending the outcome of arbitration. (D.I. 6) On February 3, 2020, the parties appeared before the Hon. Garrett E. Brown (the "Arbitrator") for a preliminary hearing. (D.I. 28, Ex. 1) On February 20, 2020, the Arbitrator entered a scheduling order. (*Id.*) Pursuant to this scheduling order, briefing on the issue of arbitrability was completed on February 26, 2020. (*Id.*) The Arbitrator has declined to address the briefing on the issue of arbitrability prior to this court's determination on the pending motion to dismiss. (D.I. 30)

### c. The Collaboration Agreement

Section 3.3.1 of the Collaboration Agreement outlines the process by which ownership of Improvements shall be assigned. Specifically, section 3.3.1 states that:

> **3.3.1  Improvements.** In the event that, during the Term, [DSC] conceives, develops or reduces to practice an Improvement[4] that relates to the Drug Conjugation Technology,[5] [DSC] shall promptly notify SGI of the discovery of

---

[4] The Collaboration Agreement defines "Improvements" as: "all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology; provided that Improvements shall not include any of the foregoing developed by SGI that, within a reasonable time period after such inventions, discoveries or know-how are made or identified, SGI determines are subject to payment or other financial obligations to one or more Third Parties, which instead shall be included in New Technologies." (D.I. 9, Ex. 1 at 4)

[5] "Drug Conjugation Technology is defined as: "(a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic of cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to [DSC] pursuant to the Research Program." (D.I. 9, Ex. 1 at 3)

> such Improvement.  SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by [DSC], [DSC] hereby assigns all of its right, title and interest therein to SGI.  SGI's interest in any such Improvements that it Controls shall be included in the SGI Technology and made available to [DSC] via the Exclusive License provided in Article 3.  [DSC] may use such Improvement assigned to SGI by [DSC] for any purpose within the scope of the Exclusive License granted herein solely during the Term of this Agreement.

(D.I. 9, Ex. 1 at 11)  The Collaboration Agreement includes a choice of law provision that provides that the Agreement shall be governed by and construed in accordance with the laws of the State of Washington.  (*Id.* at 32)

Moreover, section 19.3 of the Collaboration Agreement provides a Dispute Resolution provision, which states, in relevant part:

> **19.3  Dispute Resolution.**  The Parties agree that if any dispute or disagreement arises between [DSC] on the one hand and SGI on the other in respect of this Agreement, they shall follow the following procedure in an attempt to resolve the dispute or disagreement.
>
>> **19.3.1**  The Party claiming that such a dispute exists shall give notice in writing ("Notice of Dispute") to the other Party of the nature of the dispute;
>>
>> **19.3.2**  Within fourteen (14) business days of receipt of a Notice of Dispute, a nominee or nominees of [DSC] and a nominee or nominees of SGI shall  meet in person and exchange written summaries reflecting, in reasonable detail, the nature and extent of the dispute, and at this meeting they shall use their reasonable endeavors to resolve the dispute;
>>
>> **19.3.3**  If, within a further period of fourteen (14) business days, the dispute has not been resolved, the President of SGI and an Executive Officer of [DSC] shall meet at a mutually agreed upon time and location for the purpose of resolving such dispute;
>>
>> **19.3.4**  If, within a further period of thirty (30) business days, the dispute has not been resolved or if, for any reason, the required meeting has not been held, then the same shall be submitted by the Parties for resolution by an arbitral body in Seattle, Washington *in accordance with the then-current commercial arbitration rules of the American Arbitration Association ("AAA") except as otherwise provided herein* . . . .

> . . .
>
> **19.3.6** Notwithstanding the foregoing, any disputes relating to inventorship or the validity, enforceability or scope of any patent or trademark rights shall be submitted for resolution by a court of competent jurisdiction.

(*Id.* at 32-33) (emphasis added)  Section 13.6 of the Collaboration Agreement provides that section 19, which governs dispute resolution, survives the termination of the agreement. (*Id.* at 28)

## III.  LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks omitted). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## IV.   DISCUSSION

Defendant argues that the threshold issue of arbitrability should be decided by an arbitrator. (D.I. 7 at 18-19)  Courts, not the arbitrator, decide questions of arbitrability unless there is "clear and unmistakable evidence" that the parties intended otherwise. *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014); *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006). "Virtually every circuit to have considered the issue has determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (internal punctuation omitted) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)).

Here, the parties incorporated the AAA rules into the arbitration provision of the Collaboration Agreement, noting that any unresolved dispute "shall be submitted by the Parties for resolution by an arbitral body in Seattle, Washington *in accordance with the then-current commercial arbitration rules of the American Arbitration Association ("AAA") except as otherwise provided herein*." (D.I. 9, Ex. 1 at 32) (emphasis added)  This incorporation serves as

clear and unmistakable evidence that arbitrability is to be determined by an arbitrator, and not the court. *See Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, C.A. No. 18-698-RGA, 2018 WL 4905593, at *2 (D. Del. Oct. 9, 2018).

Plaintiff attempts to distinguish defendant's cited legal authority, *Chesapeake Appalachia*, *Temsa*, and *In re Estate of Anches*. (D.I. 20 at 8 & n.10) The Third Circuit in *Chesapeake Appalachia* analyzed *class arbitrability*. *See Chesapeake Appalachia*, 809 F.3d at 763-66. Specifically, the Third Circuit noted "the whole notion of class arbitration implicates a particular set of concerns that are absent in the bilateral context," and consequently concluded that the incorporation of the AAA rules into an agreement was insufficient to provide "clear and unmistakable evidence" that the parties in a class arbitration agreed to arbitrate arbitrability. *Id.* at 764. This case is inapposite, as the present action concerns a bilateral arbitration dispute. Plaintiff states that the *Temsa* decision is distinguishable because the parties signed two separate agreements. (D.I. 20 at 8 n.10) However, in *Temsa*, the court concluded that the parties' incorporation of the AAA rules in their agreement was "clear and unmistakable evidence" that the parties intended for the Arbitrator, and not the court, to decide arbitrability and the number of agreements had no bearing on this determination. *Temsa*, 2018 WL 4905593, at *2. Plaintiff cites *Tacoma Narrows Constructors* to argue that Washington courts have found that incorporation of arbitration rules does not establish clear and unmistakable evidence of agreement to arbitrate arbitrability. (D.I. 20 at 9 n.11) However, *Tacoma Narrows Constructors* is distinguishable, as the agreement at issue incorporated the Rules of Conciliation and Arbitration of the International Chamber of Commerce, rather than the AAA rules. *See Tacoma Narrows Constructors v. Nippon Steel-Kawada Bridge, Inc.*, 156 P.3d 293, 298 (Wash. Ct. App. 2007). Moreover, the Washington Court of Appeals in *In re Estate of Anches* noted that "[b]y

8

incorporating the AAA rules into the arbitration provision, the parties again expressed their intent to have the arbitrator, and not a court, decide arbitrability." *In re Estate of Anches*, 2019 WL 3417100, at *2 (Wash. Ct. App. July 29, 2019).

Furthermore, plaintiff argues that the parties dispute the scope of patent rights and, therefore, their dispute falls outside of the arbitration clause and the question of arbitrability should be decided by the court. (D.I. 20 at 10-17)  Specifically, plaintiff argues that, because the parties dispute the "scope of any patent . . . rights," the dispute should be "submitted for resolution by a court of competent jurisdiction," pursuant to section 19.3.6 of the Collaboration Agreement.[6] (*Id.*; D.I. 9 at 33)  On the other hand, defendant asserts that the present dispute regarding the ownership of the patents and patent applications in issue does not pertain to the *scope* of patent rights and, therefore, should follow the dispute resolution process outlined in section 19.3.4 in the Collaboration Agreement. (D.I. 7 at 13-18)  The parties' arguments regarding whether the dispute falls within the scope of the arbitration clause within the Collaboration Agreement go directly to the question of arbitrability.  *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004) (noting that the

---

[6] Plaintiff's position in the pending motion that the "scope" of patent rights removes the dispute from section 19.3.4 of the Collaboration Agreement and puts it within the jurisdiction of the court under section 19.3.6 of the Collaboration Agreement, does not comport with the allegations in its complaint.  For example, the complaint avers that DSC "seeks a judgment declaring its ownership rights to the Patents and Patent Applications at Issue and affirming that SGI does not have any ownership rights because the Patents and Patent Applications at Issue are not Improvements of Drug Conjugation Technology as defined in the now-expired Collaboration Agreement [DSC] had with SGI." (D.I. 1 at ¶ 14)  These allegations appear consistent with SGI's Demand for Arbitration, which avers, "This is not a question of patent scope or inventorship.  Rather, it is a question of what constitutes an Improvement as set forth in the Agreement and whether DSC complied with its obligations under the Agreement.  Such a dispute is subject to arbitration under the Agreement.  SGI has followed the procedure provided in the Agreement for seeking resolution of the parties' dispute, while DSC has not." (D.I. 9, Ex. 3 at ¶ 5) (internal citation omitted)

9

FAA limits the role of courts to assess arbitrability by determining "(1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the scope of the agreement."). However, as discussed *supra*, the incorporation of the AAA rules indicates that the threshold question of arbitrability should be determined by an arbitrator, and not the court.

Defendant argues that the case should be dismissed as unripe because plaintiff failed to follow the dispute resolution procedures outlined in section 19.3.4 of the Collaboration Agreement and filed suit in this court before meeting a second time with defendant. (D.I. 7 at 20-21) However, the timeliness of the arbitration demand is governed by 19.3.4, and, thus, is related to the threshold arbitrability issue. As the court recommended *supra*, arbitrability is to be determined by the Arbitrator.

Accordingly, the court recommends denying defendant's motion to dismiss for failure to state a claim and granting defendant's motion to stay, pending the determination of arbitrability.

## V.   CONCLUSION

For the foregoing reasons, the court recommends denying defendant's motion to dismiss for failure to state a claim and granting defendant's motion to stay. (C.A. No. 19-2087, D.I. 6) The court further recommends that the parties provide a joint status report to the court no later than one week following the Arbitrator's ruling on arbitrability.

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than April 1, 2020, for review by the court, along with a motion supported by a

declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: March 25, 2020

_____
Sherry R. Fallon
United States Magistrate Judge